Sam Gold and Inez Gold v. Commissioner.
Gold v. Commissioner
Docket No. 59591.
United States Tax Court
T.C. Memo 1958-2; 1958 Tax Ct. Memo LEXIS 233; 17 T.C.M. (CCH) 6; T.C.M. (RIA) 58002; January 13, 1958
*233 The petitioner, Sam Gold, the owner of all the stock of one corporation, entered into an agreement purporting to sell such stock to another corporation. Held, that since the purchasing corporation was also owned by the petitioner, and in view of the other facts and circumstances, the amounts received under the agreement did not constitute capital gain within the intendment of section 117(a) of the Internal Revenue Code of 1939, but, rather, constituted taxable dividends. Held, further, that the petitioner has failed to show that he is entitled to a greater deduction for travel and entertainment expenses than allowed by the respondent. Abraham Agran, Esq., 1 North La Salle Street, Chicago, Ill., for the petitioners. J. Bruce Donaldson, Esq., for the respondent. ATKINS
*234 Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the calendar years 1949 and 1950 in the respective amounts of $4,093.50 and $6,572.48. The principal question is whether amounts received by the petitioner Sam Gold, constituted proceeds from the sale of his stock in a wholly-owned corporation and, therefore, capital gains, or whether they constituted ordinary income. Also involved is the proper amount deductible as travel and entertainment expense. Findings of Fact Some of the facts are stipulated and are found accordingly, the stipulation being incorporated herein by this reference. The petitioners are husband and wife and reside in Chicago, Illinois. They filed joint income tax returns for the calendar years 1949 and 1950 with the collector of internal revenue for the first district of Illinois. Inez Gold is a petitioner herein *235 only because of having joined with her husband in filing a joint return, and the petitioner Sam Gold will hereinafter be referred to as the petitioner. The petitioner is a producer of sales promotional campaigns usually involving toys, gadgets, or novelties which he creates as premiums such as are commonly associated with breakfast foods and other products. Einson-Freeman Co., Inc., a Delaware corporation organized in 1929 with its principal office and place of business in Long Island, New York, is engaged in business as a commercial lithographer. On April 1, 1944, the petitioner and Einson-Freeman Co. entered into a written agreement creating a venture known as the "Chicago Joint Venture" for the purpose of carrying on a business of developing sales promotion plans and designing, and manufacturing premiums and display items to be used in connection therewith. Therein the petitioner agreed to devote his full time and skill, it being recognized that he had the staff, facilities, contacts and experience for the development of the program. Einson-Freeman agreed to the use of its facilities in furtherance of the business, including the use of its Chicago office as the headquarters *236 of the joint venture. Petitioner was to have charge of such office. All orders were to be solicited and billed in the name of Einson-Freeman. It was agreed that Einson-Freeman should keep a complete and separate set of books for the venture, maintained on an accrual basis and a fiscal year ending March 31. The net income of the joint venture was to be shared two-thirds to petitioner and one-third to Einson-Freeman. The net income was to be determined by deducting from the gross receipts of Einson-Freeman on sales secured by the Chicago office, the cost of jobs and the expense of running the Chicago office. Various types of expenses are listed, including an amount of $300 per week (i.e., $15,600 per year) to be drawn by the petitioner, and any traveling expenses of the petitioner or any employee of the Chicago office in connection with the business of the joint venture. The contract contained a provision, which was personal to the petitioner and which was not a part of the "Chicago Joint Venture," for the payment to the petitioner of a royalty on sales of certain items by Einson-Freeman (whether or not such items were created by the petitioner). It was provided that Einson-Freeman should *237 have the right to assign its interest in the joint venture, remaining, however, as guarantor of performance and payment, but that the petitioner should not have the right to assign his interest except upon written consent of Einson-Freeman. The agreement was for a period of one year, renewable automatically from year to year unless terminated by either party upon notice at least 30 days before April 30 in any given year. Under this agreement the petitioner created the ideas for premiums and developed sales promotional campaigns, packaging, posters, display items, television script, etc. The development required the services of artists, draftsmen and copy writers. The petitioner andother salesmen undertook to sell these promotional ideas as a package deal which included the full development of campaigns and the production and supply of the novelties, cut-outs, etc. The joint venture was successful in selling these sales promotional plans to large nationally known concerns engaged in various businesses, such as the electrical, breakfast food, liquor, and soft drink businesses. The displays and premiums used were produced at the Einson-Freeman plant on Long Island, the joint venture *238 being charged actual cost. On January 27, 1947, Sam Gold, Inc. was organized as a corporation under the laws of Illinois. All of its outstanding stock, consisting of ten shares of $100 par value each, was issued to the petitioner. Its balance sheet immediately after incorporation shows assets of $1,000, consisting of cash paid in for stock. On February 1, 1947, Einson-Freeman Co., Inc. and Sam Gold, Inc. entered into a joint venture which was also to be known as the "Chicago Joint Venture." The previous joint venture, to which the petitioner personally was a party, was terminated and this new joint venture, with Sam Gold, Inc. substituted for the petitioner, was continued in its stead. The terms of this second joint venture were in all respects the same as the terms of the first joint venture except that Sam Gold, Inc. was substituted for Sam Gold. After the incorporation of Sam Gold, Inc., the venture continued to operate in the same manner as before and the petitioner continued to receive a salary of $15,600 per year. In February 1947 and on July 2, and July 14, 1947, Sam Gold, Inc. loaned the petitioner the respective amounts of $10,000, $15,000 and $10,000. On September 6, 1947, Advertising *239 Associates, Inc. was organized as a corporation under the laws of Illinois. The books of the corporation show a capitalization of $1,000, consisting of good will. Its outstanding stock, of a par value of $10 per share, was issued as follows: 90 shares in the name of Philip Wain, a member of a firm of accountants, and 10 shares in the name of Robert Foster, the attorney who incorporated Advertising Associates. Neither of those individuals gave any consideration for the stock and neither had any beneficial interest in the stock. In early 1949 the stock in the name of Foster was transferred to the name of Wain, without consideration. At no time since 1948 has Wain had physical possession of any of the certificates of stock. His interest in the shares was merely nominal. They were held in his name for the petitioner. On September 8, 1947, a contract was entered into between Advertising Associates, Inc. and the petitioner, under the terms of which the petitioner was to sell to Advertising Associates all the outstanding stock of Sam Gold, Inc., consisting of 10 shares, for a consideration of $225,000, payable in installments, without interest, of $20,000 on October 20, November 20, and *240 December 20, 1947 and $2,000 on January 20, 1948 and each month thereafter until the full purchase price was paid. It was provided that to secure the payment of the purchase price, the petitioner should have as collateral security a prior lien on the general assets of Advertising Associates enforceable without notice on failure to pay any two successive installments. The contract was signed for Advertising Associates by Philip Wain. On September 9, 1947, the petitioner transferred the 10 shares to Advertising Associates. The following is a balance sheet of Sam Gold, Inc. on September 8, 1947: Sam Gold, Inc.
Balance Sheet per Books as at September 8, 1947 *
Assets: Cash - Exchange National Bank - Regular Account
$ 517.51
Cash - Exchange National Bank - Payroll Account
1,729.79
Account Receivable - Sam Gold
1,350.72
Loans Receivable - Sam Gold
35,000.00
Account of Robert J. Savitt **
6,900.00
Total Assets
$45,498.02
Liabilities: Advances from Einson-Freeman
$62,428.22
Accrued Federal Old Age Benefit Tax
26.13
Employees Income Tax Withheld
1,496.70
Accrued Federal Unemployment Tax
37.81
Total Liabilities
$63,988.86
Net Worth: Capital Stock
$ 1,000.00
*241 On September 8, 1947, Advertising Associates carried no assets on its books other than good will in the amount of $1,000. Advertising Associates borrowed from Sam Gold, Inc. on October 28, December 15, and December 31, 1947, the respective amounts of $20,000, $20,000 and $23,000. These sums were used to make payments to the petitioner, purportedly pursuant to its contract, of the amounts of $20,000 on October 31, 1947, and $40,000 on December 31, 1947. On January 26, 1948, Sam Gold, Inc. adopted a resolution of dissolution. On January 31, 1948, its assets and liabilities were distributed to its sole stockholder, Advertising Associates and it ceased to do business. On June 29, 1948, Sam Gold, Inc. was formally dissolved. A balance sheet of Advertising Associates as of January 31, 1948, after *242 the liquidation of Sam Gold, Inc. (except for some cash in the amount of $3,991.41 retained in Sam Gold, Inc., but later distributed) reflects assets and liabilities recorded on the books, as follows: Assets: Cash
$ 3,000.00
Accounts Receivable - Sam Gold
1,103.42
Loans to Sam Gold
35,000.00
Goodwill
183,832.75
Total Assets
$222,936.17
Liabilities: Accounts Payable - Joint Venture
$ 1,350.72
Advances from Einson-Freeman
26,726.14
Purchase Contract Payable
165,000.00
Accrued Federal Income Tax
27,077.88
Accrued Salesman's Commissions
929.93
Other Accrued Liabilities
851.50
Total Liabilities
$221,936.17
Capital Stock: 100 shares common stock, par value $10 per share
1,000.00
Total Liabilities and Capital Stock
$222,936.17
On February 1, 1948, Einson-Freeman Co., Inc., and Advertising Associates, Inc. entered into a joint venture again known as the "Chicago Joint Venture." This venture agreement was the same in most essential respects as the preceding agreement and was substituted therefor. It was provided that Advertising Associates was to receive from gross income of the venture a yearly amount of $15,600 to be paid its executives. *243 Advertising Associates paid this amount as salary to the petitioner. It was provided that any traveling expenses of Advertising Associates or employees of the Chicago office and travel and entertainment expense of salesmen were to be deducted as expense of the joint venture. Two categories of profits were established in which "premium net income" was to be shared two-thirds by Advertising Associates and one-third by Einson-Freeman, and "display net income" was to be shared 50-50. The operation of the joint venture under this latest agreement continued in all respects as before. There was no change in the role taken by the petitioner as head of the Chicago office of the joint venture or in his duties and obligations. During the years 1948, 1949, and 1950, Advertising Associates made payments to the petitioner, purportedly under the stock sale contract, in the respective amounts of $24,000, $18,000 and $18,000. In each of the years 1949 and 1950 the accumulated and current earnings of Advertising Associates were substantially in excess of the amounts paid to the petitioner. The incorporation of Sam Gold, Inc., the incorporation of Advertising Associates, Inc., and the purported *244 sale of stock of Sam Gold, Inc., by the petitioner to Advertising Associates, Inc., were all undertaken upon advice given to the petitioner by Philip Wain. It was Wain's advice that the sale of the stock to Advertising Associates would result in a capital gain to the petitioner. Although the stock of Advertising Associates was issued in the name of Wain, he never received any dividends or distributions from that organization, and although he was listed as the president and treasurer of the company, he never received any salary or compensation as an officer or director. The accounting firm of which he was a member performed accounting services for the corporation and received fees therefor. In the latter part of 1947 Wain moved to Los Angeles where he opened a branch office of his accounting firm. He continued to consult with the petitioner and advise him on accounting, taxes, and other business matters in 1948 when he made trips from Los Angeles to Chicago. After 1948 his trips to Chicago were infrequent. The petitioner did not receive the full amount called for in the purported stock sale agreement. The monthly payments finally ceased altogether and the purported stock sales *245 agreement was abandoned. The joint venture between Einson-Freeman and Advertising Associates ceased in 1951. Thereupon Advertising Associates became inactive. Whether it continued in existence is not disclosed. Thereafter the petitioner continued in the same type of work as before with Einson-Freeman, but not in the relationship of a joint venture. A new arrangement was made whereby Einson-Freeman paid the petitioner, as an individual, on a straight royalty basis. In their joint income tax returns for each of the years 1949 and 1950 the petitioners reported $17,920 as long-term capital gain from the sale in 1947, upon the installment basis, of the stock of Sam Gold, Inc. In the notice of deficiency the respondent included in income for each year the full amount of $18,000 received by the petitioner with the following explanation: "The receipt of $18,000.00 in this year as alleged payments received from the sale of stock, and reported as a long-term capital gain, is determined to be ordinary income as defined by section 22(a) of the Internal Revenue Code of 1939. It is held that this is not within the purview of section 117 of the Internal Revenue Code of 1939." The amount *246 of $18,000 received by the petitioner in each of the years 1949 and 1950 constituted dividends from Advertising Associates, Inc. In addition to his activities in creating sales promotional ideas, the petitioner also engaged in much of the selling activity. In connection therewith the petitioner did considerable traveling and entertaining of representatives of various nationally known companies. He made trips to various cities, including New York, Philadelphia, Cleveland, and Cincinnati. He kept a record of the major expenses while on trips, such as railroad fares and hotel bills, and also some of his out-of-pocket expenses. He submitted expense accounts and was reimbursed. He also incurred expenses in Chicago, which included the entertainment of customers, but made no claim for reimbursement of the Chicago expenses. Both in Chicago and while traveling he incurred out-of-pocket expenses of which he kept no record. These expenses included cost of taxi fares, lunches, cocktails, dinners, and theatre tickets. Sometimes theatre tickets would cost as much as $20 each, and dinner for a group would often cost $30 or $40. He and his accountant estimated that in 1950 out-of-pocket expenses *247 would amount to $50 per week, or $2,600 per year. The petitioner also maintained a summer home in Nippersink, Wisconsin, a resort area, where he spent four or five months each year. On occasions he entertained prospective customers at this summer home, principally on week ends, furnishing his guests meals. He kept checks for groceries purchased while entertaining business guests. Of this amount he treated 80 percent as attributable to his guests and 20 percent as attributable to himself and his wife. In this amount there was not included other grocery bills or other expenses of his home. He made no claim for reimbursement of any of the expenses at his Nippersink home. In the joint income tax return for the year 1950, the petitioner included in income an amount of $6,308.05 as expenses reimbursed to him by Advertising Associates, Inc. His other reported income was $15,600 as salary from Advertising Associates, and $29,572.64 received from Einson-Freeman Co., Inc., without explanation of this latter item. In such return he claimed as a deduction ordinary and necessary business expenses totaling $22,010.45. This amount was made up of numerous items, including "travel expense" in the *248 amount of $9,644.57 and "entertainment of clients and sales promotion" in the amount of $8,876.56, a total of these two items of $18,521.13. Included in this total was the amount referred to above of $2,600 for out-of-pocket expenses, and some amount for food consumed at the Nippersink home. In the notice of deficiency the respondent disallowed $3,798.79 of the "travel and entertainment expense" without specifying any particular items making up this disallowed amount. Opinion The first question presented is whether, as claimed by the petitioner, the amount of $18,000 received by him in each of the years 1949 and 1950 represented, to the extent of $17,920, long-term capital gain from the sale of his stock of Sam Gold, Inc. to Advertising Associates, Inc., or ordinary income as determined by the respondent. Originally the petitioner, in his individual capacity, entered into a joint venture with Einson-Freeman for the exploitation of the business of sales promotion. The petitioner was to contribute his particular creative ability and talents to the enterprise. Under that arrangement his share of the profits would have constituted ordinary income to him. Upon the advice of an accountant *249 and primarily, if not entirely, for the purpose of deriving tax advantage, Sam Gold, Inc. was incorporated, with the petitioner as its sole stockholder, to take the place of the petitioner personally in carrying out the joint venture. A new agreement of joint venture was entered into between Sam Gold, Inc. and Einson-Freeman, but the petitioner's activities and the general operations continued essentially as before. Shortly after six months thereafter, a new corporation, Advertising Associates, Inc. was created. Nominally the accountant and an attorney were its shareholders, but the evidence establishes that the beneficial owner of the stock was the petitioner. The petitioner entered into an agreement to sell his Sam Gold, Inc. stock to Advertising Associates for $225,000, payments to be made upon an installment basis over a period of approximately seven years. The new corporation borrowed $63,000 from its newly-acquired subsidiary, Sam Gold, Inc., in order to make the initial installment payments in 1947 as called for by the contract. Shortly thereafter Sam Gold, Inc. was liquidated into its parent, Advertising Associates, and was dissolved. The joint venture continued under a new *250 agreement substantially the same as the previous agreements, but with Advertising Associates, Inc., substituted for Sam Gold, Inc. Here again, there was no change in the operations of the joint venture or the petitioner's activities in connection therewith. At the time that the agreement for sale of the stock of Sam Gold, Inc. was executed calling for a purchase price of $225,000, Sam Gold, Inc., according to its balance sheet, had liabilities in excess of its assets, excluding its share of the current year's profits from the operation of the joint venture. Obviously, the only substantial value inherent in the stock of Sam Gold, Inc. was the prospect of profit from the joint venture, the success of which depended largely, if not almost entirely, upon the personal ability and efforts of the petitioner. The new corporation, Advertising Associates, which undertook to pay the petitioner $225,000 under the contract, had no tangible assets at all at that time. The only source from which it could pay the installment payments called for in the contract was future earnings from the joint venture. Obviously, this series of transactions was pursuant to a plan to convert what would be ordinary *251 income in the hands of the petitioner into capital gain for tax purposes. In fact the testimony of the petitioner is substantially to this effect. There can be no doubt, of course, that a taxpayer may decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits. Commissioner v. Tower, 327 U.S. 280; Gregory v. Helvering, 293 U.S. 465. However, for tax purposes the form in which the parties cast a particular transaction may be ignored if the substance of their dealings was, in fact, different from the way they would have it appear. Higgins v. Smith, 308 U.S. 473, and Gregory v. Helvering, supra.Considering all the facts in the instant case, it is our conclusion that the purported sale was not a bona fide sale resulting in the realization of capital gain within the intendment of section 117 (a), Internal Revenue Code of 1939. It is apparently the position of the petitioner that the sale of the stock was at arm's length because he was not the owner of the stock of Advertising Associates. We are satisfied from the testimony and other evidence that he was the beneficial owner and *252 that Wain was merely the nominal stockholder of record. There was, therefore, no third party interest involved here. In entering into these arrangements the petitioner was essentially dealing with himself since he owned all the stock of both corporations. Rather, in substance, the transactions constituted an arrangement for the distribution of the earnings and profits of Sam Gold, Inc. and Advertising Associates. In effect, Advertising Associates was a continuation of, or a substitute for Sam Gold, Inc. After the purported sale the petitioner continued as the sole stockholder and the net result was that he had withdrawn the earnings and profits of the two corporations. In the years in question, 1949 and 1950, he withdrew in this manner a total of $36,000 and it has been stipulated that the accumulated earnings and current profits of Advertising Associates were substantially in excess of the amounts in question. Under the circumstances we approve the respondent's determination that the amounts in question are taxable to the petitioner as ordinary income. Sections 22(a) and 115(a), Internal Revenue Code of 1939. Of the total amount of $18,521.13 which the petitioner in the joint return *253 for 1950 claimed as deductions for travel and entertainment expenses, the respondent allowed $14,722.34 and disallowed $3,798.79. The petitioner contends that the respondent erred in disallowing any portion of the amount. The burden was upon him to show that he was entitled to deduct an amount greater than that allowed by the respondent. The only evidence which the petitioner introduced had to do with certain out-of-pocket expenditures of which no record was kept, but which he and his accountant had estimated to have amounted to $2,600 in 1950. There was some evidence to the effect that the petitioner had expenditures for groceries consumed at his summer home while entertaining business guests, but the amount so expended was not established by the evidence. At the hearing and on brief, counsel for the petitioner contended that the amount disallowed by the respondent consisted of $2,000 of the $2,600 claimed as out-of-pocket expenses and $1,798.79 representing the amount of the grocery bill allocable to business guests at his Nippersink home. However, as stated, there is no evidence to show the amount of deductible expenditures made in connection with the Nippersink home. Furthermore, *254 at the hearing counsel for the respondent did not concede that these were the items which were disallowed, and there was no evidence to show what particular items made up the $3,798.79 which was disallowed by the respondent. For all that appears from the record the amount of $14,722.34 which the respondent allowed may have included amounts for out-of-pocket expenses and for expenses incurred in connection with the Nippersink home. Upon the record before us we must hold that the petitioner has failed to sustain the burden of showing that he is entitled to deduct as travel and entertainment expenses any amount greater than the amount allowed by the respondent. See Estate of Merlin H. Aylesworth, 24 T.C. 134. Decision will be entered for the respondent. Footnotes
*. Sam Gold, Inc. was engaged in a joint venture with Einson-Freeman. Sam Gold, Inc.'s distributive share of the profits derived by said venture for the period from February 1, 1947 to September 8, 1947 are not reflected herein since the partnership was on a fiscal year ended January 31, 1948. ↩
**. This represents advances to a salesman made for sales commissions, earned or unearned.↩